**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 23, 2025**

# In the Court of Appeals of Georgia

A25A0616. IN THE INTEREST OF D. B. et al., CHILDREN.

HODGES, Judge.

The Fulton County Department of Family and Children Services ("DFCS") filed an emergency ex parte request and dependency petition to remove minor children D. B. and R. W. from their mother's custody one month after their sibling shot himself in the family's apartment. The juvenile court granted the ex parte request, and the children were removed. The mother moved to dismiss the petition, arguing that the ex parte procedure violated her due process rights and that she should have had a pre-removal hearing in the absence of any allegations by DFCS that her children were in any immediate danger. Following an evidentiary hearing, the juvenile court denied the mother's motion to dismiss on the ground that DFCS had followed

applicable statutory procedures. However, the court dismissed the dependency petition on the merits, finding "absolutely no probable cause to believe the children are dependent." The mother appeals, challenging the juvenile court's due process ruling. For reasons that follow, we affirm.

The record shows that on June 8, 2024, minor children D. B. and R. W. lived with their mother and three siblings, including their 13-year-old brother, S. W. At 1:00 a.m. that morning, S. W. shot himself in the head in the family's apartment. S. W. was taken to the hospital, where he died three days later.

(a) *The first ex parte petition.* On July 9, 2024 — a month after the shooting — DFCS filed a dependency complaint alleging that D. B., R. W., and their remaining two siblings were dependent because S. W. had "obtained a gun and shot himself" and "[t]he department ha[d] concerns regarding inadequate supervision" and the "lack of a caregiver to keep the children safe." The complaint alleged that the mother had "p[re]vious history with the department for concerns of inadequate supervision, inadequate food, clothing/shelter, and educational neglect" and that the family "has had history each year from 2018 until 2024."

Along with the dependency complaint, DFCS filed an emergency request for an ex parte order for protective custody of the children. This filing consisted of a pre-printed form with multiple check-boxes for DFCS to indicate its rationale for seeking immediate removal of the children from the mother's custody. DFCS checked boxes indicating that the children were *not* in immediate danger from their surroundings, that their placement in shelter care was *not* necessary to protect persons or property, that DFCS did *not* have a good faith belief that the children may abscond or be removed from the juvenile court's jurisdiction, and that the children were *not* without a parent or guardian to provide supervision and care. Nevertheless, DFCS claimed that it needed immediate custody of the children due to the mother's inability to keep them safe, based on her prior history with DFCS and her possession of an unsecured weapon in the home.

On July 10, 2024, the juvenile court denied the petition and ex parte removal request. In its written order, the court explained:

> Under oath, case manager testified that the children were not in immediate harm or danger; 2 of the children are placed with a legal father; mother is cooperative and case has been referred to family preservation. 2 SAAGs advised caseworker not to request removal, but upper DFCS mgt wanted to request removal.

(b) *The second ex parte petition.* The next day, July 11, DFCS filed a second dependency petition and emergency request for an ex parte protective custody order permitting immediate removal of the children. This second petition included the same allegations as the first, but it additionally claimed:

> The child, [S. W.], was able to gain access to an unsecured weapon in the home and shot himself in the head in front of his seven year old brother, [R. W.]. There are severe concerns regarding inadequate supervision in the home as the mother and sibling children were aware of the unsecure[d] weapon in the home and the child was able to gain access to it. The mother has demonstrated to the [sic] lack the parenting knowledge and skills to keep her children safe. There is a current law enforcement investigation in which the children will be required to complete forensic interviews regarding the incident.

Once again, DFCS indicated on the form's check-boxes that the children were *not* in immediate danger, their placement in shelter care was *not* necessary to protect persons or property, DFCS did *not* believe the children would abscond or be removed from the court's jurisdiction, and the children were *not* without the supervision of a parent or guardian.

The same juvenile court judge who denied DFCS's first emergency request granted the second one, entering an ex parte dependency removal order giving DFCS

immediate custody of the children. This time, the court found that removal was necessary due to

> inadequate supervision resulting in the death of sibling by an unsecured weapon in the home in front of the child [R. W.]; mother and sibling children were aware of the unsecured weapon; law enforcement investigation ongoing. Victim child [S. W.] shot himself in the head with the weapon resulting in his death; mother has ongoing history with the department.

The juvenile court scheduled a preliminary protective hearing for July 15. Based on the court's order, D. B. and R. W. were removed from the mother's custody and placed in foster care, and their siblings went to live with their legal father.

The mother obtained the assistance of an attorney, and the juvenile court appointed a lawyer to represent the children. At the request of the mother's attorney, the juvenile court continued the preliminary protective hearing until August 2. The court ordered D. B. and R. W. to remain in DFCS's custody pending the hearing, and it dismissed the dependency petition as to the two remaining siblings because they were with their legal father.

Through her attorney, the mother moved to dismiss the dependency petition without prejudice for "failure to follow procedural safeguards" when removing D. B.

and R. W. from her custody. The mother alleged that she had a due process right to a hearing *before* DFCS removed the children from her custody because DFCS had not alleged that they were in any imminent danger. As a remedy for this alleged due process violation, the mother asked the court to dismiss the case without prejudice and "immediately return" D. B. and R. W. to her custody.

(c) *The preliminary protective hearing.* At the preliminary protective hearing, the juvenile court considered both the mother's motion to dismiss and the merits of DFCS's dependency petition. The DFCS caseworker testified that the family came to the attention of DFCS when S. W. shot himself. The shooting occurred while the mother was asleep and all five children were home. As far as the caseworker knew, the mother had behaved appropriately after the shooting — both at the home and at the hospital. Afterward, the mother and her other children moved in with family members. DFCS offered counseling and other services to the family, and the mother was "receptive."

The caseworker testified that the gun S. W. used did not belong to the mother and that no other guns were found in the apartment.[1] R. W., who apparently witnessed

---

[1] The caseworker testified that the mother had once stored a gun in a closet in the residence, but she had told the children to stay away from it, and it was no longer

the shooting, disclosed to authorities that he knew S. W. had a gun, but he was "keeping it secret from the mom and everyone." According to the caseworker, R. W. thought S. W. had likely obtained the gun from "another kid in the community that the mom told her kid not to hang out with." There is no evidence that the mother knew about the gun, and she was not charged with any crime in relation to S. W.'s shooting.

As for the mother's history with DFCS, the caseworker explained that DFCS had received prior reports of "educational neglect [and] concerns for inadequate food, clothing, [and] shelter," but those reports were largely "unsubstantiated." None of the past reports involved a firearm or a child attempting self-harm. The caseworker testified that there was no evidence that D. B. and R. W. were abused or neglected while they were with their mother, either before or after S. W.'s shooting, and the children wanted to be with her.

When asked about the basis for the removal petition, the caseworker responded that "upper leadership" at DFCS wanted the children removed, even though "upper leadership" had never met the family, visited their home, or talked to the children.

---

present.

The caseworker concluded her testimony by stating, "There's nothing saying [the mother] can't care for her kids."

After the caseworker testified, the mother's attorney introduced the medical examiner's report on S. W.'s death. In the report, which was released the day before DFCS filed the first removal petition, the medical examiner ruled that S. W.'s death was a suicide. The report indicated that S. W. was "well developed and well nourished," and it identified no signs of abuse beyond those associated with the gunshot. Finally, the children's attorney argued that DFCS had no basis for removing the children and that the dependency petition should be denied.

(d) *The juvenile court's ruling.* Following the hearing, the juvenile court denied the mother's motion to dismiss the dependency petition based on due process violations. The court ruled that in seeking the children's ex parte removal, DFCS "followed the appropriate due process procedures" of the Juvenile Code. Although the court expressed "concerns about the validity of the information" in DFCS's second petition that led to the emergency removal of the children, the court noted that "the procedures as outlined by the code were followed."

Nonetheless, the juvenile court dismissed the dependency petition as meritless, finding "absolutely no probable cause to believe the children are dependent." Further, the court scolded DFCS for taking the children away from their mother:

> This is a tragic accident that the Department has compounded by removing the children from the home. The mother had previously worked with the Department and showed willingness to continue participating with services after her child's death. In taking these children away from the mother, the state has compounded the trauma on this family and may have destroyed the mother's ability to trust in the state in the future should she need assistance.

The court ordered DFCS to return the children to the mother immediately, and DFCS apparently complied.

The mother appeals, challenging the juvenile court's denial of her motion to dismiss on due process grounds. She argues that, in the absence of any allegation of imminent danger to the children, she was entitled to a hearing on her parental fitness *before* her children were removed from her custody, not *after*. The mother argues that the Juvenile Code supplies DFCS with two avenues for seeking custody — an "ordinary" pathway in which a parent must be given notice and an opportunity to appear at an adjudication hearing to answer the allegations in the dependency petition;

and an emergency pathway described in OCGA § 15-11-132 in which DFCS may seek ex parte removal only under "exceptional circumstances." See OCGA § 15-11-132 (b). In cases of ex parte removal, a parent has no opportunity to be heard until the juvenile court holds a preliminary protective hearing, which generally must be scheduled within 72 hours of removal. See OCGA § 15-11-145 (a). Although the Juvenile Code does not define "exceptional circumstances," the mother contends that we should interpret the term to mean that DFCS can seek ex parte removal only when it alleges an imminent or exigent threat to the children. The mother further contends that DFCS frequently abuses the ex parte procedure, as it did here, by seeking emergency removal without alleging any emergency.[2]

1. Although DFCS has not moved to dismiss this appeal, it argues in its appellate briefs that the appeal is moot.[3] We do not agree.

OCGA § 5-6-48 (b) (3) requires the dismissal of an appeal "[w]here the questions presented have become moot." See *Crary v. Clautice*, 318 Ga. 573, 576 (2)

---

[2] DFCS, on the other hand, takes the position that the Juvenile Code allows it to seek removal of a child through the ex parte procedure in *any* dependency case, whether or not an imminent or exigent threat is alleged or shown.

[3] We granted oral argument in this case and directed the parties to brief the issue of mootness.

(899 SE2d 98) (2024) ("Mootness is an issue of jurisdiction and thus must be determined before a court addresses the merits of a claim.") (citation and punctuation omitted). A case is moot "[w]hen the remedy sought in litigation no longer benefits the party seeking it[,]" *McAlister v. Clifton*, 313 Ga. 737, 738 (1) (873 SE2d 178) (2022) (citation and punctuation omitted), or when resolution of the case "would be tantamount to the determination of an abstract question not arising upon existing facts or rights." (Citation and punctuation omitted.) *In the Interest of M. F.*, 305 Ga. 820 (828 SE2d 350) (2019).

Applying these definitions here, DFCS contends that this case is moot because the mother has already won the relief she sought in her motion to dismiss — the return of her children — and nothing we do here can further benefit her. The mother, on the other hand, argues that this case is not moot because the due process issues it presents are capable of repetition yet evade review. We agree with the mother.

In *Collins v. Lombard Corp.*, our Supreme Court held that cases involving issues that are capable of repetition yet evade review are not moot.[4] The Court concluded

---

[4] The Court noted that such cases have often been described as an "exception" to the mootness doctrine. *Collins*, 270 Ga. at 121 (1). However, the Court reasoned, if appellate courts must dismiss moot cases, then logically there can be no exceptions to the mootness doctrine. Id. The Court avoided this contradiction by declaring that

that such cases "would be based on existing facts or rights which affect, if not the immediate parties, an existing class of sufferers." (Citation and punctuation omitted.) 270 Ga. 120, 122 (1) (508 SE2d 653) (1998). In reaching this conclusion, the Court cited with approval our decision in *In the Interest of I. B.*, 219 Ga. App. 268 (464 SE2d 865) (1995) (physical precedent only). In that case, we concluded that a case is not moot if there is "[i]ntrinsically insufficient time to obtain judicial review for a claim common to an existing class of sufferers[.]" Id. at 273. The Supreme Court held that this analysis was "correct." *Collins*, 270 Ga. at 121 (1).

In *In the Interest of I. B.*, a father was placed on DFCS's child abuse registry after his son alleged that the father had slapped and kicked him. 219 Ga. App. at 268. The father petitioned the juvenile court to expunge his name from the registry and challenged the constitutionality of the statute establishing the registry. Id. The juvenile court granted the expungement on the merits, finding no reasonable basis for placing the father on the registry. Id. In a later order, the court dismissed the father's

---

cases presenting issues capable of repetition yet evading review are not *exceptions*; rather, they are not moot in the first place. Id. at 121-122 (1).

12

constitutional challenge as moot. Id. The father appealed that ruling, but we affirmed,[5] holding that the constitutional challenge was neither (1) capable of repetition nor (2) likely to evade review. Id. at 277.

As to the first question, the father argued that "there is a reasonable expectation of recurrence" because DFCS could place his name on the registry again. (Punctuation omitted.) *In the Interest of I. B.*, 219 Ga. App. at 276. We rejected this possibility as "speculative," concluding that the father's "own 'live controversy' lost its steam when the court granted his petition[,]" and he "does not represent, and has never represented, a class of persons whose petitions were denied." Id. Regarding the second question, we reasoned that "the constitutionality of the statute does not inherently or eternally evade review, because anyone whose petition is denied can present it to the Supreme Court if it is properly raised and ruled on in the trial court." Id. at 276.

This case, however, presents a different scenario. The mother asserts that her due process challenge is capable of repetition because DFCS routinely uses the ex

[5] The father appealed to the Supreme Court, which transferred the case to this Court upon finding that its jurisdiction over constitutional questions was not invoked because the trial court had not ruled on that issue. *In the Interest of I. B.*, 219 Ga. App. at 268.

parte removal procedure without alleging any immediate danger to the child or other exigent circumstances. DFCS does not deny doing so; instead, its position is that using the ex parte practice when there are no exigent circumstances does not violate a parent's due process rights. Thus, the possibility that this issue will recur does not seem speculative, and unlike the father in *In the Interest of I. B.*, the mother in this case does represent "an existing class of sufferers." *Collins*, 270 Ga. at 122 (1).

The mother also claims that the due process issue will continue to evade review given the fast-track nature of the ex parte proceeding. As noted, when DFCS executes an ex parte removal, a parent receives a hearing within 72 hours after the removal. That is a very short period of time — far too short for the adjudication of a legal challenge based on the denial of a pre-removal hearing. Yet it may be quite a long time for a child who is not in any imminent danger to be forcibly separated from his or her parents. Because this case presents an issue that is likely both to recur and to evade review, it is factually distinguishable from *In the Interest of I. B.*

In the wake of *In the Interest of I. B.*, we have ruled that appeals from temporary protective orders may not be moot, even if the orders have expired. In *Birchby v. Carboy*, 311 Ga. App. 538 (716 SE2d 592) (2011), for example, Birchby appealed from

a 12-month family violence protective order. Although the order had expired by the time the appeal reached us, we ruled that the case was not moot: "Given the time constraints of appellate courts, orders in effect for 12 months often expire before an appellate decision is issued. Accordingly, we must address whether the various issues are common to an existing class, yet tend to evade review." (Citation and punctuation omitted.) Id. at 540 (2). We determined that most of Birchby's claims of error "involve issues that both affect an existing class of sufferers and tend to evade review," and we therefore addressed them on the merits. (Citation and punctuation omitted.) Id. at 541 (2); see also *Baca v. Baca*, 256 Ga. App. 514, 516 (1) (568 SE2d 746) (2002) (holding that multiple issues raised in an appeal from an expired protective order were not moot because they were capable of repetition, yet evaded review).

Although the plaintiffs in *Birchby* and *Baca* lost at the trial court level, whereas the juvenile court ruled in favor of the mother on the merits in this case, that distinction does not affect our jurisdictional analysis. The fact that the juvenile court granted the father's requested relief in *In the Interest of I. B.* was not the deciding factor in the mootness inquiry. In other words, that case was moot not because the

father won on the merits below, but because the alleged violation of his constitutional rights was not capable of repetition and did not evade review. As discussed above, that analysis is different here. As with *Birchby* and *Baca*, this case presents a similar "time constraints" problem, and therefore it is not moot.[6]

2. Turning to the merits of the mother's appeal, she argues that the juvenile court violated her due process rights when it granted, absent exceptional circumstances, DFCS's ex parte request to remove her children. We disagree.

(a) *Due process.* According to the Supreme Court of the United States, three elements must be evaluated in deciding what due process requires: "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions. We must balance these elements against each other[.]" *Lassiter v. Dept. of Social Svcs. of Durham County*, 452 U. S. 18, 27 (II) (B) (101 SCt

---

[6] The mother also argues that her appeal is not moot, even though she received the substantive relief she sought in the juvenile court, because she faces collateral consequences from the removal order and denial of her motion to dismiss. We are sympathetic to this argument. See *In the Interest of K. P.*, 365 Ga. App. 38, 41-42 (877 SE2d 289) (2022) (holding that juvenile court's preliminary protective order was not moot, even though DFCS dismissed underlying dependency action, because the mother could face negative collateral consequences from the order). However, we need not address the mother's collateral consequences argument in light of our conclusion that her appeal is not moot because the due process issue is capable of repetition yet evades review.

2153, 68 LE2d 640) (1981). Indeed, due process "emphasizes fairness between the State and the individual dealing with the State[.]" *Evitts v. Lucey*, 469 U. S. 387, 405 (III) (C) (105 SCt 830, 83 LE2d 821) (1985) (citation and punctuation omitted). "[T]he phrase expresses the requirement of fundamental fairness." (Punctuation omitted.) *Lassiters*, 452 U. S. at 24 (II).

"Substantive due process requires that [a] statute not be unreasonable, arbitrary or capricious, and that the means have a real and substantial relation to the object sought to be obtained. The law must rationally relate to a legitimate end of government." *Hayward v. Ramick*, 248 Ga. 841, 843 (1) (285 SE2d 697) (1982). Procedural due process, on the other hand, requires a fair procedure. See generally *Dave v. State*, 365 Ga. App. 1, 8 (3) (876 SE2d 882) (2022) (finding that due process required that a court hearing comport with principles of fundamental fairness). The fundamental idea of due process is notice and an opportunity to be heard. *In the Interest of I. P.*, 371 Ga. App. 790, 793 (1) (903 SE2d 184) (2024). As relevant in this case, "[o]rders prepared ex parte do not violate due process and should not be vacated unless a party can demonstrate that the process by which the judge arrived at them

was fundamentally unfair." (Citation and punctuation omitted.) *Fuller v. Fuller*, 279 Ga. 805, 806 (1) (621 SE2d 419) (2005).

(b) *The Juvenile Code*. The Juvenile Code's purpose is clear: "[T]his chapter shall be liberally construed to reflect that the paramount child welfare policy of this state is to determine and ensure the best interests of its children." OCGA § 15-11-1. The intent of the General Assembly in passing the Juvenile Code was to "preserve and strengthen family relationships, countenancing the removal of a child from his or her home only when state intervention is essential to protect such child and enable him or her to live in security and stability." Id. The Juvenile Code further "seeks to guarantee due process of law, as required by the Constitutions of the United States and the State of Georgia, through which every child and his or her parent and all other interested parties are assured fair hearings at which legal rights are recognized and enforced." Id. In short, the Code provides a streamlined process that protects the welfare of children while safeguarding the rights of parents. Id.

The Juvenile Code outlines the process for removing a child from his or her home without the consent of his or her parents. OCGA § 15-11-133 (a) provides the baseline removal procedure, stating that removal may occur either (1) pursuant to an

order of the court under the article or (2) by a law enforcement or duly authorized officer of the court if a child is in imminent danger of abuse or neglect if he or she remains in the home or if a child is the victim of trafficking for labor or sexual services under OCGA § 16-5-46. "Any order authorizing the removal of a child from his or her home shall be based on a finding by the court that continuation in his or her home would be contrary to his or her welfare." OCGA § 15-11-134 (a).

OCGA § 15-11-132 outlines a more specific removal procedure. That statute provides: "The facts supporting the issuance of an order of removal may be relayed orally, including telephonically, to the judge or a designated juvenile court intake officer, and the order directing that a child be taken into custody may be issued orally or electronically." OCGA § 15-11-132 (a). The statute continues:

> When a child is taken into custody under exceptional circumstances, an affidavit or sworn complaint containing the information previously relayed orally, including telephonically, shall be filed with the clerk of the court the next business day, and a written order shall be issued if not previously issued. Only when a child is taken into custody under exceptional circumstances can an affidavit or sworn complaint be filed. The written order shall include the court's findings of fact supporting the necessity for such child's removal from the custody of his or her

parent, guardian, or legal custodian in order to safeguard such child's welfare and shall designate a child's legal custodian.

OCGA § 15-11-132 (b). Again, the court's order authorizing the removal of the child from his or her home shall be based on a finding by the court that such removal is necessary because continuation in his or her home would be contrary to his or her welfare. OCGA §§ 15-11-132 (b), 15-11-134 (a).

When a child is removed from his or her home under exceptional circumstances, DFCS must "promptly notify the parent, guardian, or legal custodian of the nature of the allegations forming the basis for taking a child into custody and, if such child is not released, of the time and place of the preliminary protective hearing." OCGA § 15-11-132 (d). The parents are entitled to a preliminary protective hearing to contest the removal within 72 hours after the child is removed. OCGA § 15-11-145 (a). Notice of the preliminary protective hearing must be given to the parents. OCGA § 15-11-145 (b). At such hearing, the parents are informed of their "due process rights, including the parties' right to an attorney and to an appointed attorney if they are indigent persons, the right to call witnesses and to cross-examine all witnesses, the right to present evidence, and the right to a trial by the court on the

allegations in the complaint or petition." OCGA § 15-11-145 (f) (3). "If a child is not released at the preliminary protective hearing, a petition for dependency shall be made and presented to the court within five days of such hearing." OCGA § 15-11-145 (g).

At the preliminary hearing in this case, both attorneys argued that OCGA § 15-11-132 "lays out the procedure that [the] Juvenile Court has accepted and enacted and follows regarding what has to be done in order for [an] order of removal to be indicated." Neither party challenges the applicability of that statute as the proper vehicle for DFCS to seek ex parte removal of the children under the circumstances of this case. The question presented in this appeal is whether the "exceptional circumstances" language in OCGA § 15-11-132 (b) required DFCS to demonstrate exigent circumstances or an imminent risk of harm to the children's safety before an ex parte removal order was authorized and, if so, whether such circumstances existed in this case.

(c) *Analysis*. First, we conclude that the removal procedure outlined in OCGA § 15-11-132 does not violate any substantive due process concerns. The statute, designed to protect the State's children by immediately removing a child from his or her home upon a finding that continuation in the home would be contrary to the

21

child's welfare, is neither unreasonable, arbitrary, nor capricious. See OCGA §§ 15-11-132, 15-11-134 (a); *Hayward*, 248 Ga. at 843 (1). While "[t]he right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances[,]" *In the Interest of B. R. J.*, 344 Ga. App. 465 (810 SE2d 630) (2018) (citation omitted), the State has a legitimate interest in the subject (protecting children) and there is a rational relationship between the means used (immediate ex parte removal) and this object. *Hayward*, 248 Ga. at 843 (1).

Second, we conclude that the removal procedure outlined in OCGA § 15-11-132, as applied in this case, is consistent with the requirements of fair procedure and does not violate any procedural due process concerns. It is evident that the legislature understood the impact of immediately removing a child from his or her home and, accordingly, instituted stringent procedural safeguards, including a requirement that a removal must be based on exceptional circumstances and a preliminary hearing to contest the removal must occur within 72 hours of the child's removal. OCGA §§ 15-11-132 (b), 15-11-145 (a). At this preliminary hearing, the parents are entitled to a

number of due process rights as explained earlier in this opinion. OCGA § 15-11-145 (f) (3).

Balancing "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions[,]" see *Lassiter*, 452 U. S. at 27 (II) (B), we conclude that the removal system designed by the legislature in OCGA § 15-11-132 comports with the requirements of fair procedure and does not violate a parent's due process rights if properly followed.

We thus turn to an analysis of whether the removal procedure outlined in OCGA § 15-11-132 was properly followed in this case. According to the record, at the time DFCS requested the removal of the mother's children from her home, it provided a detailed explanation of the circumstances justifying the removal. Specifically, the July 11, 2024 emergency request for an ex parte order for protective custody contained an affidavit detailing the facts surrounding DFCS's request and opining that "[t]he mother has demonstrated . . . the lack of parenting knowledge and skills to keep her children safe." This document noted, "two of the mother's remaining children stated the gun was retrieved from a closet in the home and [the mother] was aware of the weapon being there." The request indicated that removal

was "the *only and necessary* solution" because the mother "lack[ed] the capacity to keep the children safe as the family has had history each year from 2018 until 2024 with concern of inadequate food, clothing/shelter, supervision, and educational neglect." (Emphasis in original.)

Likewise, the dependency complaint noted that one of the mother's children had gained access to an unsecured gun in the home and shot himself in the head in front of his seven-year-old brother. According to the complaint, "[t]he department ha[d] concerns regarding inadequate supervision as [the mother] ha[d] p[re]vious history with the department for concerns of inadequate supervision, inadequate food, clothing/shelter, and educational neglect." In fact, the family "had history [with DFCS] each year from 2018 until 2024." DFCS requested removal "due to there being concerns for lack of a caregiver to keep the children safe." The complaint stated that a law enforcement investigation regarding the shooting was pending.

Based on these documents, the juvenile court issued a July 11, 2024 written ex parte order authorizing the removal to safeguard the children's welfare due to "inadequate supervision[.]" The order concluded that continuation in the home was

contrary to the children's welfare and that removal was in the children's best interests.

Following the children's removal from their home, the mother was afforded all procedural safeguards required by the Juvenile Code, including a prompt preliminary protective hearing. The preliminary protective hearing was originally scheduled within the 72-hour statutorily mandated time frame, though the parties agreed to a continuance of the originally scheduled hearing. At the hearing, the mother was given the opportunity to contest the removal by presenting evidence and examining witnesses. Ultimately, the juvenile court determined that the children were not dependent and ordered their return to the mother. The mother does not raise any argument challenging the preliminary hearing procedures.

Instead, the mother argues that she was deprived of due process when the juvenile court issued the ex parte removal order because DFCS failed to show the existence of any "exceptional circumstances" justifying the children's removal. The mother acknowledges that the Georgia Juvenile Code does not define the term "exceptional circumstances" but urges this Court to "interpret exceptional circumstances to include an objective determination of exigency based on a finding of

probable cause that the child's health and welfare is at imminent risk of harm." Based on the statute's plain language, we decline to adopt this interpretation of the "exceptional circumstances" language in OCGA § 15-11-132 (b).

We begin by noting the well-settled principles involved in conducting a statutory analysis:

> [I]n analyzing the meaning of a statute, our charge as an appellate court is to presume that the General Assembly meant what it said and said what it meant. And toward that end, we must afford the statutory text its plain and ordinary meaning, consider the text contextually, read the text in its most natural and reasonable way, as an ordinary speaker of the English language would, and seek to avoid a construction that makes some language mere surplusage. In sum, where the language of a statute is plain and susceptible of only one natural and reasonable construction, an appellate court must construe the statute accordingly.

(Citation and punctuation omitted.) *In the Interest of S. D.*, 365 Ga. App. 559, 562 (2) (b) (879 SE2d 648) (2022). "[O]ur interpretive task often begins and ends with the text itself[.]" (Citation and punctuation omitted.) *In the Interest of T. B.*, 313 Ga. 846, 850 (3) (874 SE2d 101) (2022). As long as the plain words of a statute "do not produce any absurd, impractical, or contradictory results, then this Court is bound to follow the meaning of those words." (Citation omitted.) *In the Interest of B. C.*, 333 Ga.

26

App. 763, 764 (777 SE2d 52) (2015). Moreover, "[t]he courts in construing a statute can neither add to nor take away from it." (Citation and punctuation omitted.) *Kirkland v. Lee*, 160 Ga. App. 446, 449 (1) (287 SE2d 365) (1981). With those general guiding principles in mind, we also highlight that our goal in construing a statute is to determine its legislative purpose, see *In the Interest of B. C.*, 333 Ga. App. at 764, and the General Assembly's express intent in creating the Juvenile Code — of which OCGA § 15-11-132 is a part — was to "determine and ensure the best interests of [the State's] children." OCGA § 15-11-1.

Applying these statutory construction principles, we conclude that the legislature plainly meant what it said and said what it meant when it utilized the phrase "exceptional circumstances" in OCGA § 15-11-132 (b). As conceded by the mother, "exceptional" is defined as "forming an exception" or "deviating from the norm." In fact, Black's Law Dictionary defines the term as "[u]nlikely to occur often; out of the ordinary course; uncommon or unusual." Black's Law Dictionary 706 (12th ed. 2024). "Exigent," on the other hand, is defined as "[r]equiring immediate action or aid; urgent." Id. at 717. Likewise, "imminent" is defined as "threatening to occur immediately; dangerously impending." Id. at 895. And "emergency" is defined as

"[a] sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm." Id. at 659. Exigent, imminent, and emergency are *not* synonymous or interchangeable with exceptional. The "most natural and reasonable" interpretation of the phrase "exceptional circumstances" is uncommon or unusual situations. While this phrase might encompass exigent or emergency situations, the phrase does not require such circumstances. See generally *In the Interest of T. B.*, 313 Ga. at 852 (3) (reading statutory language using the "most natural and reasonable" interpretation); *In the Interest of S. D.*, 365 Ga. App. at 562 (2) (b) (same). Applying the mother's interpretation of the statutory language would impose a stricter requirement — requiring the circumstances to demand immediate action or urgent need — not included in the statutory text that plainly demands only uncommon or unusual circumstances. "Courts may not rewrite a statute under the guise of interpreting it. Such changes must be made by the legislature, not by judicial fiat." (Citation and punctuation omitted.) *PTI Royston v. Eubanks*, 360 Ga. App. 263, 271 (1) (861 SE2d 115) (2021).

In addition, contrary to the mother's argument, the phrase "exceptional circumstances" does not refer to the method in which DFCS seeks to remove the

child from his or her home. The mother asserts that "[i]t would deviate from the norm (exceptional) to seek ex parte removal under circumstances where DFCS demonstrated that a child is imminently (exigency or emergency) threatened with harm." We conclude that the phrase "exceptional circumstances" in OCGA § 15-11-132 (b) refers to the circumstances surrounding the necessity for the child's removal, not the procedure employed to remove the child, and, given the facts of this case, we conclude that the juvenile court was authorized to find that the circumstances justifying removal in this case were exceptional. It is undisputed that the mother's 13-year-old son shot himself in the head, killing himself, in front of his 7-year-old brother while in the family's apartment, and two of the mother's children stated that the gun came from a closet in the apartment and the mother knew the gun was in the closet. These circumstances are unusual and out of the norm.[7] In addition, the family had a lengthy history with DFCS, and, at the time DFCS presented the removal request to the court, the evidence supported a finding that removal was necessary because the mother inadequately supervised the children and "demonstrated . . . the lack [of]

---

[7] We decline to adopt a bright-line rule to define the term "exceptional circumstances." As noted in OCGA § 15-11-134 (c), "[f]indings [justifying removal from the home] shall be made on an individualized case-by-case basis and shall be documented in the court's written order."

parenting knowledge and skills to keep her children safe." Here, the removal of the children complied with the procedure delineated in OCGA § 15-11-132 (b).

In summary, while the purpose of the statutes addressing a child's removal from his or her home is "[a]bove all . . . to reflect that the paramount child welfare policy of this state is to determine and ensure the best interests of its children[,]" OCGA § 15-11-1, the Juvenile Code includes stringent safeguards to protect a parent's due process rights. Indeed, the court's discretion is not unbridled when presented with a request for an ex parte removal order under OCGA § 15-11-132. The court must determine whether exceptional circumstances exist and whether removal of the child is necessary because continuation in his or her home would be contrary to his or her welfare. OCGA §§ 15-11-132 (b), 15-11-134 (a). In fact, the court in this case declined to sign an order removing the children when DFCS presented its first request, presumably because DFCS failed to demonstrate exceptional circumstances under OCGA § 15-11-132 (b) or facts supporting a finding that continuation in their home would be contrary to the children's welfare under OCGA § 15-11-134. In addition, procedural safeguards mandating a prompt, post-removal hearing following the issuance of an ex parte removal order ensure that parents have a quick, fair

opportunity to challenge the removal allegations. See *Fuller*, 279 Ga. at 806 (1) (holding that ex parte orders do not violate due process "unless a party can demonstrate that the process by which the judge arrived at them was fundamentally unfair") (citation and punctuation omitted).

In this case, DFCS and the juvenile court adhered to the procedural safeguards established by the legislature for the issuance of ex parte removal orders under OCGA § 15-11-132, and the procedures provided the mother notice and an opportunity to be promptly heard. As such, the mother's due process rights were not violated. Compare *In the Interest of R. B.*, 346 Ga. App. 564, 566 (1), 569-570 (1) (816 SE2d 706) (2018) (finding mother's due process rights were violated where trial court failed to hold a preliminary hearing within 72 hours after the children were removed, give the mother proper notice of the hearing, and make required written findings as to the children's welfare).

*Judgment affirmed. Pipkin, J., concurs; and McFadden, P. J., concurs as to Division One and dissents as to Division Two.*

# In the Court of Appeals of Georgia

A25A0616. IN THE INTEREST OF D. B. et al., CHILDREN.

McFADDEN, Presiding Judge, concurring in part and dissenting in part.

I fully concur in Division 1 of the majority opinion; this case is not moot. But I dissent to Division 2. DFCS takes the position that the legislature has provided parents a "post-removal process" that provides "a fair opportunity to challenge the allegations without unnecessarily burdening the initial removal decision with additional prongs or requirements. In Division 2, the majority agrees with that position, holding that it "does not violate any substantive due process concerns."

I disagree. So does the Supreme Court of the United States. "[P]arents are constitutionally entitled to a hearing on their fitness *before* their children are removed from their custody." *Stanley v. Illinois*, 405 U.S. 645, 658 (III) (92 SCt. 1208, 31 LE2d 551) (1972) (emphasis added). "[O]ur Juvenile Code is subordinate to and must be construed in light of the fundamental rights recognized by the federal and Georgia constitutions." *In the Interest of R. B.*, 346 Ga. App. 564, 575 (816 SE2d 706) (2018)

(Dillard, C.J., concurring). I would construe Georgia's Juvenile Code to be in accord with *Stanley*.

In Georgia, subject to certain specified exceptions, judges may "not initiate, permit, or consider ex parte communications." Ga. Code of Judicial Conduct ("CJC") Rule 2.9 (A). The relevant exception provides that they may "when authorized by *law* to do so, such as when issuing temporary protective orders, arrest warrants, or search warrants, or when serving on therapeutic, problem-solving, or accountability courts, including drugs courts, mental health courts, and veterans' courts." CJC Rule 2.9 (A) (5) (emphasis in original). So, for example, courts presented with family violence petitions may "may order such temporary relief ex parte as it deems necessary to protect the petitioner or a minor of the household from violence." OCGA § 19-13-3 (b).

Certainly ex parte relief is necessary to protect minor children in some dependency cases. In fact the Juvenile Code authorizes children to be taken into custody by a law enforcement officer or officer of the court without an order of the court in some cases — but only in a tightly restricted set of cases that involve

"imminent danger of abuse or neglect" or "trafficking for labor or sexual servitude. . . ." OCGA § 15-11-133 (a) (2) (B).

The Juvenile Code provision that authorizes ex parte orders of removal is applicable "under exceptional circumstances[.]" OCGA § 15-11-132 (b). The majority errs in authorizing ex parte proceedings in the mill run of dependency cases and in construing "exceptional circumstances" to be meaningless.

So construed, that provision does not raise the constitutional issues the majority addresses. So we need not address those issues or the antecedent question whether we are authorized to address them.[1]

As the majority's accurate summary of the facts makes clear, this case is exceptional only in the extent to which DFACS compounded a tragedy. I would vacate the initial removal decision, hold that the juvenile court erred in granting ex parte relief in this case and in denying the mother's motion to dismiss, and hold that before

---

[1]See Ga. Const. of 1983, Art. VI, Sec. 6, Par. II (1) (granting our Supreme Court exclusive appellate jurisdiction in "all cases in which the constitutionality of a law, ordinance, or constitutional provision has been drawn in question); *Lucas v. Lucas*, 273 Ga. 240, 242 (3) (539 SE2d 807) (2000) (holding that appellate courts "will not rule on a challenge to the constitutionality of a statute unless the issue has been raised and ruled on in the trial court").

granting ex parte relief, juvenile courts must consider whether extraordinary circumstances exist.

**July 17, 2025**

## ON MOTION FOR RECONSIDERATION

The mother in this case filed a motion for reconsideration of this Court's order affirming the juvenile court's decision that denied her motion to dismiss a dependency petition on due process grounds. The motion for reconsideration is DENIED. However, the above opinion is hereby substituted for the original opinion dated June 23, 2025.

MCFADDEN, Presiding Judge, dissenting on motion for reconsideration.

# In the Court of Appeals of Georgia

A25A0616. IN THE INTEREST OF D. B. et al., CHILDREN.

McFadden, Presiding Judge, dissenting on motion for reconsideration.

I dissent from denial of the motion for reconsideration. The majority has now issued a substituted opinion. I write again to address one way the majority has not revised its original, now-superseded opinion and one way that it has.

The majority has not corrected its failure to address the United States Supreme Court's opinion in cited *Stanley v. Illinois*, 405 U. S. 645, 658 (III) (92 SCt. 1208, 31 LE2d 551) (1972). I cited that case in my original dissent for the proposition that, under the Due Process clause, "parents are constitutionally entitled to a hearing on their fitness *before* their children are removed from their custody."(emphasis added). We are, of course, "bound by the Constitution of the United States as its provisions

are construed and applied by the Supreme Court of the United States." *Nordahl v. State*, 306 Ga. 15, 20 (1) (829 SE2d 99) (2019) (citation and punctuation omitted). Nevertheless the majority omitted any mention of *Stanley* in its original opinion. Appellant's motion for reconsideration repeatedly points out that omission. But nowhere in the half dozen pages the majority adds on reconsideration does it acknowledge *Stanley*.

On the other hand, the majority no longer construes "extraordinary circumstances" to be meaningless. Unfortunately the meaning the majority has now selected makes no sense. For the majority, "extraordinary circumstances" means "uncommon or unusual circumstances;" and that meaning is untethered to urgency, to impending danger, to a need for immediate action to avoid harm, or to imminent danger. So what, for the majority, constitutes an uncommon or unusual circumstance? Novelty? Newsworthiness? Political salience? Entertainment value?

> The majority's application of its newly-minted construction sheds little light.

> [G]iven the facts of this case, we conclude that the juvenile court was authorized to find that the circumstances justifying removal in this case were exceptional. It is undisputed that the mother's 13-year-old son shot himself in the head, killing himself, in front of his 7-year-old brother while in the family's apartment, and two of the mother's children stated

3

that the gun came from a closet in the apartment and the mother knew the gun was in the closet.[1] These circumstances are unusual and out of the norm.[2]

The majority derives its construction of "extraordinary circumstances" from dictionary definitions read in isolation. That's not how it's done. "[S]tatutory text is not properly read in a vacuum but, instead, must be considered in light of the surrounding text and the statute's broader context because context is a primary determinant of meaning." *North American Senior Benefits v. Wimmer*, 319 Ga. 641, 645

---

[1]The majority does not reconcile this with its earlier recitation that:
The caseworker testified that the gun S. W. used did not belong to the mother and that no other guns were found in the apartment.[] R. W., who apparently witnessed the shooting, disclosed to authorities that he knew S. W. had a gun, but he was "keeping it secret from the mom and everyone." According to the caseworker, R. W. thought S. W. had likely obtained the gun from "another kid in the community that the mom told her kid not to hang out with." There is no evidence that the mother knew about the gun, and she was not charged with any crime in relation to S. W.'s shooting.
The majority further recited in a footnote that "[t]he caseworker testified that the mother had once stored a gun in a closet in the residence, but she had told the children to stay away from it, and it was no longer present."

[2]I do not read the majority's reference in that same paragraph to "a lengthy history with DFCS" to find that history to be another extraordinary circumstance. Such histories are the rule rather than the exception in dependency cases, and in this case the caseworker testified that the underlying reports were "largely unsubstantiated."

(906 SE2d 373) (2024) (citation an punctuation omitted). The Juvenile Code opens with a statement of purpose which says in part, "It is the intent of the General Assembly to preserve and strengthen family relationships, countenancing the removal of a child from his or her home only when state intervention is essential to protect such child and enable him or her to live in security and stability." OCGA § 15-11-1.